State of Vermont v. 3M Company, case number 24-1250. Good afternoon. Good afternoon, your honors, and may it please the court. Michael Scogar here on behalf of the appellant 3M. Your honors, the district court here made the same errors that the district court made in Katrone, relying on what the removing party purportedly knew or should have known, rather than on whether a paper provided by the plaintiffs explicitly demonstrated removability, the legal standard this court recognized in Katrone. Accordingly, this court should overturn the decision below, just as it did in that case. Now, the controlling doctrine here draws a critical distinction. Generally, defendants may remove a case on Federal officer grounds whenever their own knowledge or investigation provides them with the facts needed to do so. There is no statutory time limit for that brand of removal. If, however, a pleading or other paper from the plaintiff explicitly demonstrates removability, again, this Court's words, then the usual rule gives way and a defendant must remove the case within 30 days of receiving that paper. This exception is extremely narrow. As this Court stated, the now universally adopted bright-line rule in Katrone, defendants have no independent duty to investigate whether a case is removable if removability is not apparent from the allegations of an initial pleading or subsequent document. The 30-day clocks are not triggered. So while there might be some exceptions to that, for example, in connection with diversity of jurisdiction, the place of incorporation and so on, you would agree that that's an exception, wouldn't you? This ties into the Raley decision from the Seventh Circuit, which — Would you agree that that's a formative exception, that it's acceptable? I would agree that that is — It's not a total bright-line rule? If it's something like the place of incorporation, that is obviously far, far and away from this case. It would be a much closer case. I don't think the Court needs to get anywhere close to that. So there are some things within the direct knowledge of the defendant that may, more or less, excuse the failure of the plaintiff to provide explicit notice. Well, Your Honor, the courts have actually rejected that time and time again. Well, that's the Seventh Circuit soft rule. We're not — I'm not standing here and agreeing that that decision came out. Okay. I was just trying to make sure that I understand. It's not a total bright-line rule? There are some exceptions? In the Seventh Circuit, they have recognized that exception, Your Honor. But I will note that if one were to draw a spectrum from that decision, even assuming it were correctly decided, right next to it, into the zone where every court has said it's too much to ask of the defendants, you have cases like Grazer, where the plaintiffs actually accuse the defendants of not hitting the few keystrokes that probably would have been required to come up with the sales data that was needed there. Readily available to the defendant didn't matter for purposes of starting the 30-day clock. So you're saying here that basically until the plaintiffs said to you in a document that this involved military contracts, you didn't have notice to remove? Is that right? That's correct, Your Honor. That's the — that is the scheme that Congress developed under 1442b. Congress knows, by the way, how to put an outside limit on this. They did so for diversity jurisdiction. Actually, are you — are you saying that the plaintiffs have ever specifically told you in any pleading or other paper that this is a potential Federal case? They never provided the — in unequivocal terms, the clear and unequivocal rules. So you don't think that the November 2023, is it? I think it's November 2023 email, the courtesy copy, you don't think that that qualifies? Is that correct? It does not, Your Honor. Even if it were a paper, and it's not, for reasons we explain, every court to have addressed — Because it's the internal-external. Exactly. It's not part of this case, Your Honor. But even if it were a paper, what's omitted from it? What — what did 3M have to find during the 30-day period? And I should add, we're only talking about a disagreement of roughly 30 days here, between when the — the court believes the clock started and when 3M articulates that it had enough information to properly remove. What did 3M do during that period? It filled the gaps — Well, let me — let me ask you. Yes. So, assume that we agree with you that even the November 10, 2023, courtesy copy email, however you want to describe it — Correct. — is not sufficient notice, and not the paper that you would require under 1446. Then — your argument is, then, that the trigger, the 30-day clock, has never been triggered. In this instance, that's correct, sir. Just as appellate courts have found in a number of other cases with similar claims, even including cases where there are claims that the defendants actually had the information at their finger — fingertips, cases like Romulus, McLaurin, Grazer, all of those involved instances where the defendants, unlike this case, purportedly had the information right there in their files — sales data, data on how often folks took breaks, their employees took breaks. Didn't matter. In all of those circumstances, that was information that the defendant had no duty to investigate. And until it was provided in the form of a paper that qualifies under 1442B, in none of those circumstances would — did the 30-day clock start. In fact, the default rule applied, which is, as soon as a defendant — Well, if you had produced a paper in discovery that showed you were aware of the fact that this involved military production, you'd be on notice at that point at least, wouldn't you? Your Honor, in a colloquial sense, on notice. But even there — and again, this is not that case. There is nothing to suggest that's the case here. Even under those circumstances, that would not start the clock. I would direct the Court for that to the Romulus decision in the Ninth Circuit. Sales data was provided to the plaintiffs by the defendants in the course of discovery. Unless and until the plaintiffs — it wasn't until the plaintiffs sent back that — took that information and calculated their proposed damages, it wasn't until that paper was received by the defendants that one of the — that the 30-day clock under 1446B3 began. So Congress has created a bright-line rule, and as this Court recognized in Katrone, it did so with good reason. Congress, again, knows how to put an outside time limit. They do so with diversity removals at one year. But there are basic — I think you agreed with me, understanding that this is not — that that's not this case. I think you agreed with me that there are some very basic facts that are part of the core institutional knowledge of a corporate defendant, say, that might qualify as — I mean, to trigger the 30-day clock.  Certainly, that is what Rainey decided. We're in no position here — no need to disagree with that decision. That is perfectly in step. I'm just trying to figure out the line. I understand. And I think that something like the state of incorporation, one can certainly understand the rationale of the Seventh Circuit in concluding that that would be — And is that because it's a practical, flexible rule at some level? I mean, it's noticed, right? So if you've got, obviously, notice about where the corporate headquarters are, the place of incorporation is, why can't it be a little bit more flexible than your — Because as this Court noted in Patron and every other circuit to answer this very question has held, Your Honor, the moment you start thinking about it in terms of what did they know — or, by the way, the district court here went further — what should 3M have known, even without evidence of what they knew? Once you start asking that question, then you go down the path of what this Court and others have described as a series of mini-trials and sideshows into what a defendant knew or ought to know. To Your Honor's point, if there is a very obvious fact that every member of a — every person at a particular corporation just has to know, like, where is it in — where is it in the court's principal place of business, that's why Ramey went the way it did. But to take this case as Exhibit A, as to the rabbit hole that one easily goes down, we're talking about having to find an employee who had been working at this place in the mid-'70s. You also want us to decide on appeal the Federal Office of Jurisdiction question. Is that correct? Your Honor, it is entirely within the Court's discretion. We will not object to the Court simply remanding. We include that only because, for efficiency's sake, it had been fully briefed below and before Your Honors. And so we included it as an alternative argument. But, of course, we will have no objection. Ultimately, you're going to have to win on that one here or there, right? Correct, Your Honor. But I guess — Yes. So I'm just — I would, with the presider's permission, just — I guess let's get into a little bit how this case differs at all from State v. Tong — State v. Tong v. Exxon Mobil. It seems to me you're alleging the same thing, that you're basically just a supplier of the government. So turning to that, Your Honor, we've alleged far more than that. We have a military specification here. We're not aware of any case in which a court has deemed operation pursuant to a military specification to be inadequate for purposes of removal or ultimately for the defense. The question is whether we have adequately pledged — What does that even mean in this context, the military specification? Sure. Thank you, Your Honor. The military specification means there is a document — we've included it in the appendix — a document from the United States government that says if, when you're producing this product for sale to the military, it has to do the following. And in this case, what's critical is that the military specification requires use of PTFE, the very chemical that's at issue in the case. But that's with or without a contract. If you want, if you aspire to have a contract with the military, the DOD, then this is what you've got to do. Is that correct? That's correct, Your Honor. And then your product is tested by the military, as ours was, and that is in the record as well. Ours was tested and performed according to military specification and was created — Slimmer in my eye that I might want to one day have a contract with DOD and I don't want to preclude or foreclose that possibility, then I've got to do this, and that's enough for federal officer jurisdiction, in your view. We don't need to get anywhere close to that circumstance here, Your Honor. The record here on removal says that the U.S. military approved CCLs manufactured at Rutland for sale to the federal government and its contractors upon qualifying the CCLs as compliant. It goes on to say the manufacturer of the PTFE-containing CCLs resulted — oh, that was the scrap material. Sorry. Customers of the CCLs included the federal government contractors purchasing mil-spec compliant PTFE-containing CCLs for the federal government for Mike DeWitt. Yeah, that sounds like there are contractors and then there are you guys, which is just suppliers. How is that different than Exxon or a gas company that is providing gasoline to the military for, you know, compliant with standards set by the government? Well, Your Honor, Exxon was just complying with — Exxon was frankly closer to something like the Watson case in the U.S. Supreme Court. They're merely complying with federal law to be able to drill in a particular area, and then they just sold it on the open market. Some of it went to the federal government, but they were selling — they were producing this for market consumption, and they were claiming that because there are limitations on where they can drill and how they can do so, that that somehow created federal officer jurisdiction. I'm — here, what we've got is something much closer to Badia, which this Court decided in 2021. Now, there you had subcontractors serving as air traffic controllers, and the — they were — Is that the Afghanistan? It is, Your Honor. Okay. It is, Your Honor. And they were — they were unquestionably subcontractors, and they were performing their duties pursuant to military protocols. But there was a contract there. There was a contract with the contractor in that case. That's true, Your Honor. But — But here we've alleged that and more. I mean, we talk about sales to the military and to — to those who then used component parts for the military. So I'm going to take your initial answer, which is that you would not object to sending it back and letting the district court judge figure this out. Absolutely. And in doing so, Your Honor, I would just add that the Supreme Court has admonished repeatedly, with regard to the merits of the defense, that is not to be adjudicated at the removal stage. That's to be adjudicated in federal court on the merits. It's the whole purpose of federal officer removals to have these questions at their merits, not in terms of pleading, but on the merits resolved in a federal tribunal. You've reserved two minutes for — Well, wait. So then Exxon was wrongly decided, I guess, is what you're saying. No, I'm not saying that at all, Your Honor. Well, it wasn't decided on the merits. It was decided here on appeal, just the same posture as this case. Well, that was a sign that the pleadings in that case were inadequate. I was merely reminding that while the pleadings surrounding the adequacy of the federal officer defense are fairly adjudicated during the removal process, what the Supreme Court has repeatedly admonished is we're not — you don't have to win your defense in order to have it removed. You have to adequately, plausibly plead the elements of the defense.  I was merely reminding of the standard applied with regard to the merits on removal as opposed to the ultimate standard applied on the merits in a federal tribunal post-removal. So we will hear from the State, and then we'll hear from you again. Thank you very much.  Good afternoon. Good afternoon. Thank you. May it please the Court. Matt Powa for the State of Vermont, and I'm joined at council table by Assistant Vermont — Assistant Attorney General Laura Murphy. Your Honor — There's another person. And my colleague, Jillian Cowley, from my law office. Thank you. Every second counts up here, so apologies to Jillian. I'll cede you 15 seconds. Thank you, Your Honor. The Court should affirm Judge Sessions' remand order in this case for several reasons. First, the removal was untimely. The State sent the Vermont DEC letter to 3M on November 2nd, 2023, and it expressly flagged the Rutland facility and the Rutland landfill were at issue in this case and that there was PFAS contamination. Now, 3M says, as Your Honors have already noted, that the military connection was not evident from that letter. But I would note that the record indicates the following admission from 3M, and this is in docket entry 15 below at page 3, footnote 2, quote, 3M did produce documents indicating that it may have made CCLs at the Rutland facility for the U.S. military. That was an admission to the district court. So they acknowledged below that the discovery documents they gave the State before the State sent the DEC letter on November 2nd included the military connection. And indeed, right on the face of the press release from 3M from the 1970s is the military connection. Now, 3M also says, well, the Vermont DEC letter did not expressly flag that we may use PFAS to make these copper-clad laminates. But in July of 2023, before we sent the letter, 3M served on us not just the documents, but an amended discovery response, an amended response to our request for production of documents. And in that written response, they said that they may have made PFAS-containing products at the Rutland facility. So, again, before we sent the letters. It is at A563 and 564. So the PFAS connection was evident from that and from another discovery document they produced us at SA120 before we sent the letter to them. In light of these facts, Your Honors, we're asking you to remand based on the same kinds of considerations that motivated the Seventh Circuit in the Raley case. So that puts a lot of the burden on the defendant, a corporate defendant with a lot of facilities and a lot of information at its disposal, but nonetheless a defendant, to investigate the military connection in this case or whatever the federal connection might be in order to prevent the 30-day clock from starting. And it puts almost none of the burden on the plaintiff, the state here, to do maybe, you know, to make it clear. And you advert to the July 2023 and then also the November 2023 documents, none of which on their face, although the November 2023 document does refer to the PFAS, none of them refer to, although I wouldn't expect that you would have this information necessarily, to a military or federal government connection. Would you agree with that? Well, we implicitly did so, Your Honor, because when we sent them the DEC letter on November 2nd, it was reflecting back to them these important documents that they had just served on us in the last few months, saying right in them, military. And we were just reflecting back to them, that stuff you told us you made for the military, it's polluting our environment. So if the letter of the courtesy copy from, I guess, another litigation from November 2023 had said or referred to the U.S. military, then I might understand what you're saying. But you use the word implicit. I mean, it's deeply buried. I don't know that it's implicit in the November 2023 exchange. Well, it really was, with respect, not deeply buried. Right? This is a case with millions of pages of documents. So why don't you say in this letter there's a military aspect to this? Because it's an affirmative defense. You know, this is where you get into applying Cutrone to an affirmative defense, and this case becomes much more like Raley, where, you know, there it was complete preemption. Here it's the military contractor defense. You know, it's really not our business to tell them that they have a defense. And the military, just to be clear, there were millions of pages of documents produced in this case and years of discovery. And then all of a sudden, they tell us, oh, we're amending our discovery response. Guess what? We made PFAS products in Vermont. And here's 300 documents. This was in July of 2023, after years of litigation. Right? Here's 300 out of millions that mention the military, a press release saying the  And then we send them a letter saying, well, you know, you better clean it up. And they say, oh, well, you didn't tell us it was the military. Well, they just told us. And we were reflecting back to them with a DEC letter, time to clean it up, and we threatened damages. Well, Mr. Scottrow's view is that, yeah, it requires that sort of dance, that they can tell you the information, and once you have it, then you have to make a notice in the letter. What's the response to that? That is the argument. And, you know, a sort of knee-jerk or reflexive application of the case law might arguably require that result. But it would be sort of an unthinking way of applying Coutrone. And it's not in keeping with how, as far as we know, Your Honor, all the district courts have handled this issue. We're talking about Pezzo in Judge Etkin's decision in this circuit. We're talking about the Brown v. Amchem case by Judge Gardefee in this circuit. They all, these are asbestos personal injury cases dealing with a military contractor removal defense. And in both cases, these judges, summarizing many other cases, have said, you have to know if your product's mil-spec. And, in fact, those two district court cases were more sort of harsh on the defendants than what we're asking for, because there, the information in front of the defendant didn't flag their brand of product. I mean, here, I think that there's no dispute, but maybe I'm wrong. They had to go back to a former employee who then had to take them through the documents so that they could understand that at this Butlin facility where the employee worked, I think I'm right, they, in fact, manufactured this product and there was a military aspect to it. So they had to go back and do a not insignificant amount, I'll put it that way, of investigative work. Why would we want, in the context of determining whether a case is removable to federal court, a defendant to be put to its paces, so to speak? And why would we put the burden on the defendant when the statute itself seems to suggest that the burden is almost entirely on the plaintiff? Yeah. To start the clock. Start the clock. Yeah. So it may be that there's no Federal officer jurisdiction separate question. It here, like in Raley, the Seventh Circuit case, the defendant could determine the information with ease. Reasonably diligent counsel. Or as this Court said in Controne, applying a reasonable amount of intelligence because it's not true that when they found Mr. Cesaro, that former employee, that that was supposedly the first time they heard about the military connection. Not so. There was a press release that they gave us over, before we sent the DEC letter, in July of 2023, that expressly said right on the face of it, the military connection. And again, docket entry number 15 below, footnote 2, they acknowledge, 3M acknowledges it did produce documents indicating that it may have made CCLs at the Rutland facility for the U.S. military. That was their admission. And I also. Yeah. I apologize it's not in the appendix. It's 3M's opposition to our remand motion below, docket entry 15. And, you know, I also want to flag, Your Honors, if I may, that they found Mr. Cesaro, you know, apparently within days of us sending the November 2nd, 2023 email, we found out for the first time in this Court, in their reply brief on page 5 at footnote 1, that they talked to Mr. Cesaro within days of us sending this November 2nd, 2023 letter, and he confirmed the mil spec that was used at the Rutland facility in that conversation in early November as well. Now, our position is Mr. Cesaro ultimately does not matter, but it would be a very extreme set of facts, and it is an extreme set of facts in this case, to say that, you know, you can discover him, Mr. Cesaro can tell you about the mil spec, and you can still wait, like, another 50 plus days to remove. That's their position. If I have — well, I don't have time to address the merits. Breyer, I gave you some time, so you've got some time. Your Honor, we also don't believe that they have satisfied prongs one and prongs two on the merits. And in particular, they did not act under a Federal officer for the reason that the mil spec is not describing the conduct — If you want to go on, I take it you have no objection to sending that issue back to the district court, but perhaps you do. You know, I think we do, Your Honor. I think we want to get the show on the road, to be honest with you. We have a trial date coming up, and we would like this trial-ready August 31st, and, yeah, we would like this resolved when we don't want to go back down and more paper and exhibits and motions and all that. There's a disconnect here, Your Honor, between what we're suing them for and what the mil spec is all about. We're suing them for sending, at least as far as the Rutland facility is concerned, for sending waste to an unlined landfill, right? That is not what the mil spec is all about. The mil spec is how to produce a particular product. So this is like the disconnect that was noted, for example, in the Exxon case. You know, and it's unlike the case in the Second Circuit's decision in Ogden, at 986 F-3rd-179. This Court contrasted the Federal regulations at issue in Ogden, dealing with deemed community health centers, with a prior case the Second Circuit had decided, by summary order, dealing with a different community health center. And what the Court said in Ogden was, here, the regulations directly deal with the conduct for which the defendant had been sued, but not so in that other summary order case. We're more like the other summary order case because the mil spec doesn't deal with how to dispose of the waste. In that sense, you know, the Abbo-Bradley case is relevant, where, you know, in Abbo-Bradley Well, no. Let me just make sure that I understand. If, for example, there were a contract between 3M and the military, and that said, mil spec applies to this product, and they manufacture the product accordingly, not without, as I said, a glimmer inside, but because of a contract, then there would be no question that this would, I think, fall under the Federal officer provision, no?  But maybe I've misunderstood your argument. No, I think your question is right on point, and I do disagree, Your Honor. I think because the mil spec doesn't deal with the conduct for which we're suing them, which is improper disposal of the waste, as opposed to how to make a particular product. No, no, no, no, no, but Yeah. So there are degrees of relatedness, right? Here, the mil spec required that a particular product that ended up being a contaminant be part of the final, is it the PFAS? Is that what it is? Copper clad laminates. Copper clad, okay, laminates. And that contaminant is, or gives rise to this litigation, as I understand it. Is that correct? It does. So? We were, you know, the response would be, we were required to make this product. And in that product, there was this contaminant that ended up leaking or being put in a landfill and so on. Why isn't that? Like Padilla, for example, sort of a, you know, contractor, we're doing what the military tells us. And yes, it may be our fault or not. We can litigate that, that it ended up in a landfill. But the fact that the contaminant was what's, was found in the landfill, that's partly because of our contract with the federal government. That, that is a step removed. That, yes, it's a step removed from a case like Abo Bradley, however, Your Honor, where the federal specifications at issue was a consent decree under CERCLA, which, you know, had to do with how you dispose of waste. And my point was, this is how you make a product. And so they're a step removed. And if you look at Ogden, at that page I referenced, and, and at the Abo Bradley case, I think you can see that, that the federal specification here, it does not precisely match what it is we're suing from, therefore. They also have a, a probably bigger problem on the merits, which is this is sort of the ultimate case of the tail wagging the dog, in which you have, you know, one out of hundreds of sites in Vermont, the Rutland facility is only one of many different sites where we're, you know, suing them. And even there, they say they produce these copper-clad laminates with PFAS for the military for only a few years out of a, you know, 20-year run at the facility. And so we're talking about less than 1 percent. And just as this case in Exxon said that, you know, a, a tiny little bit of, of the pollution is not enough, citing the Third Circuit's decision in Hoboken, the same is true here. It would be the tail wagging the dog. Can I just go back very briefly to the notice issue? Yes. So what is the rule that you want us to embrace? Yeah, we, we want... Because you mentioned, well, in this case, there was, they, they seem to know about the military specifications as early as July 2023, at least based on the documents that they produced, right? But let's, let's say that they did know and there's nothing to show that they were aware as early as July 2023, based on the documents. Were they under any duty to investigate? No.  And Judges Etkin and Gardafi directly addressed this issue and said, look, we're charging the defendants with knowledge of that they made this particular product according to mil-spec, but we're not requiring them to do an investigation. But you're saying they're presumed to be familiar with their own business, or that's what Judge Etkin said. That's right. I mean, the facts of that complaint are, are very different. I mean, they're pretty crystal clear that all this happened while somebody was in the Navy and handling asbestos. But it seems to me you're asking us to adopt the language in PESO, which seems to be broader than what our precedents would and Supreme Court precedents would allow. Yeah. I mean, do you think that presumed to be familiar with the defendants, the defendant being presumed to be familiar with its business should be where we start in deciding when you have notice? It depends on, you know, whether or not it's the kind of thing, as the Seventh Circuit said, that could be discerned with ease or that reasonably diligent counsel can find out. So you're saying that simply saying this is Vermont, you produced this stuff in Vermont, would be enough because you're going to presume their familiarity with their business? There's so much more than that. In this record. I'm just trying to figure out where you think they hit the mark. So what, you know, what Judge Sessions said in a footnote, the end of his opinion is we don't need to, I don't need to adopt PESO. Okay. But where do you think then they, you hit the line? So you alleged initially that, you know, this is in Vermont. Then you said it's Rutland. Then you said it's a landfill in Rutland. Is that enough without even any mention of military? Or do you need some mention of military? We need some mention of military and we have it. We have it, which was the press release from 3M that they gave us before we sent them the letter. And that press release, which is at pages A566 and 567, expressly flagged, as Judge Sessions found, the military connection. And so in the context of this case, in which, you know, by the way, as soon as they gave us these discovery documents, we asked to take a 30B6 deposition of them with respect to the Rutland facility. And they said to us, and this is in the record, they said to us, we're not going to produce someone because the documents we just gave you have all the information in them. And now they want to say, oh, well, the documents weren't enough for to start a clock ticking, even though they refused to give us a witness. So, yeah, we feel that, you know, that this was they put us in a very difficult situation with this very belated removal. Your Honor, we ask you to please affirm. Thank you very much. Thank you. Thank you. Your Honor, just a couple of points I'd like to hit in response. Very quickly, the press release on which so much weight has been placed is the furthest thing from explicitly demonstrating removability in unequivocal terms, this Court's standard. It refers to military wants, and what it says is that until the 1970s, microwave industry output, not even what we were producing, but microwave industry output was concentrated primarily in military markets. Here, however, or now, however, there is expanded activity in commercial markets, such as telecommunications, air traffic, et cetera. If anything, the press release suggests that the expansion that's talked about in very broad and vague terms here may not and probably was not associated with the military. It's simply unclear. That is not unequivocal language. We've talked for a moment, Your Honors, we're talking about pressure on the defendant. The courts have made incredibly clear that we have yet to hear today an explanation for how not to split from Grazer, Romulus, McLaurin, and even this Court's decision in Katrone. All of those cases involved information that was within the possession of the defendants. Indeed, it was shown to be within the possession of the defendants in some of those cases through later disclosures. And yet, those few keystrokes it would have taken to access that information, that was not required, because if you did it, you would go down precisely the rabbit hole. This is what Katrone and all of these cases are saying. Look, we understand that in some instances, the defendant may have better access to  Putting aside the facts of this case, which required an intensive investigation, but even if it were at our fingertips in our records, those cases say we're not going to endeavor to figure out what was known and when, because that will create precise But you seem to be suggesting even more misdisclosure. You're saying that even if you knew, and there's evidence that you knew, that's not enough. You need the technical delivery of the document from them, right? That's your position. That is the rule. We don't need that to prevail here, even if, let me be clear, even if every piece of evidence they've cited up through and including the November 2nd e-mail were considered, none of it says there was a military specification pursuant to which we produced product at Rutland and the military specification required the use of the chemical at issue in the case, much less that that byproduct from that process was then disposed of. We used the time that we're being, the claim is that we took basically an extra 30 days. During that 30 days, we conducted a thorough investigation to find this information. That's precisely what the rule exists to incentivize. As this and other courts have said, we don't want to go down rabbit holes with sideshows like this. We also want to incentivize defendants not to be filing prophylactic or protective notices of removal. What would our notice of removal have looked like on November 2nd? We wouldn't yet have had the mil spec. We wouldn't yet have spoken to anyone who worked there. That would have been an incredibly speculative notice of removal, precisely what the hard and fast rule exists to avoid. And I do want to answer Your Honor's question, what is our proposed rule? I don't see a natural stopping point to plaintiff's proposed rule. It begs all of the questions that every court, including this one, has said we have to avoid in terms of what was known, what was known when, what should have been known. Instead, we would ask this court to reaffirm the rule in Catron. And just to quote it, defendants have no independent duty to investigate. Well, that would be to extend the rule in Catron beyond CAFA. Well, Your Honor, to be clear, it was interpreted, Catron was interpreting 1446B. Nothing in that language suggests that the basis for removability changes the requirements under 1442B. We seem to limit our analysis to CAFA. I think maybe for good reasons. The Court is certainly cognizant of the fact that it's a CAFA case in its written decision. But there's nothing load-bearing about CAFA in that opinion. The Court even confronts in Catron, just as these other courts of appeals have done, and I commend to the Court the decision in McLaren that we cite, where there's the lengthiest discussion of this issue of asymmetric access to information. Recall that in Catron, and the district court hits on this in Catron as well, there was a claim that the defendant had access to this information. How many mortgages were refinanced? Even under those circumstances, the Court squarely addressed that and said, we're going to apply the hard and fast rule that Congress adopted. So the theory is that there's something different about federal officer because there's a difference in access already addressed in Catron, Your Honor. Thank you very much. Thank you, Your Honor. We'll reserve the decision.